## Richmond.

Tuggle v. Berkeley and Others.

January 15, 1903.

Absent, Buchanan, J.

1. Mortgage—*Conditional Sale—Discrimination.*—In case of doubt whether a deed constitutes a mortgage or a conditional sale, equity will construe it to be a mortgage. The marks indicating a mortgage rather than a conditional sale are that no price, or an inadequate one, is set on the property; that the grantor remains in possession; and that the grantor covenants or promises to pay the money. If otherwise shown to be a mortgage, however, the promise of repayment may be implied.

2. Conditional Sale—*Time of Performance—Reasonable Time—Near Relatives.*—Where no time is fixed for the performance of a condition which will avoid a conditional sale, the law implies a reasonable time, but in transactions between near relatives, intimately associated with each other, a much longer time will be deemed reasonable than in dealings between strangers.

3. Mortgage—*Case in Judgment—Equity of Redemption—Estoppel.*—In the case in judgment a widow with a large family conveyed her life estate in her house and lot, and the garden lot adjoining, to her son-in-law in consideration of his agreement to pay delinquent taxes thereon amounting to $600, and he covenanted that he would reconvey the same to her whenever she refunded the amount and interest. The son-in-law subsequently bought the shares of all the remaindermen but one, who was an infant. He then brought suit for sale of garden lot, alleging that it was not susceptible of partition. Under proceedings in this suit he acquired the share of the infant in the garden lot, and soon thereafter sold the lot for $2,000. At that time, he claimed that the transaction with the widow was a conditional sale, and that the sale had become absolute by reason of her failure to refund. In this claim the widow fully acquiesced, and made no claim to any part of the proceeds of the sale of the garden lot. For awhile his wife boarded with the

widow in lieu of paying rent for the dwelling-house, and subsequently it was agreed that the widow should pay the taxes and insurance as compensation for the use of the house. The evidence, however, shows that the widow was wholly ignorant of her rights, or of ordinary affairs of business, and that she relied upon her son-in-law to aid her and help to relieve her of her burden. Her life estate in the whole property was worth several times as much as the taxes paid by him, and when the deed was made he stated that all he wanted was to free the property from the tax lien and preserve it as a home for the family. When the garden lot was sold he promised to convey to the widow her life estate in the house, and to two of the daughters their interest therein.

*Held:* The transaction was a mortgage, and, under all the circumstances of the case, the widow is not estopped either by her language or conduct from asserting her equity of redemption.

Appeal from a decree of the Circuit Court of Prince Edward county pronounced September 4, 1900, in a suit in chancery, wherein the appellee, Ellen W. Berkeley, and others were the complainants, and the appellant and others were the defendants.

*Affirmed.*

The opinion states the case.

*W. H. Mann,* for the appellant.

*Wilson & Manson,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

W. R. Berkeley, the husband of Ellen Berkeley (spoken of in this record as Ellen W. Berkeley) by deed of November 6, 1874, conveyed to R. B. Berkeley, his residence in the town of Farmville, the lot upon which it was situated, and an adjoining lot known as "the garden," in trust; "to be held by him, the said R. B. Berkeley, trustee, for the benefit of Ellen Berkeley during her life, and at her death, with remainder to her children, now born or hereafter to be born, subject to all the restrictions, conditions and limitations imposed by the will of

John W. Wilson, deceased, on the interest given therein to the said Ellen, who is Ellen Berkeley, and her children in the two tracts of land called 'Hors de Monde' and the home tract, or 'Spring Hill.' "

From the recitals of this deed, it appears that this home conveyed to the trustee for the benefit of the wife and her children was purchased with the proceeds of the interest of the wife and her children in two tracts of land devised to them by John W. Wilson, the father of Ellen Berkeley. There were seven of these children, and, one of them having died subsequent to his father, August 2, 1886, his share in the property descended to his mother and six brothers and sisters, so that Ellen Berkeley, at the date of her deed, hereinafter mentioned, to R. B .Tuggle, of May 17, 1893, was the owner of an estate for life in this property, and of a one-forty-ninth part of the remainder in fee, as heir of her deceased son, Willis, and each of the surviving six children was the owner of one-seventh of the remainder, acquired under the deed from their father to R. B. Berkeley, trustee, and of a one-forty-ninth interest, as an heir of their deceased brother, Willis.

In order to obtain money to prevent her life estate from being subjected to the payment of delinquent taxes on the property, Ellen W. Berkeley executed to her son-in-law, R. B. Tuggle, the deed of May 17, 1893, conveying her *life estate* in the property, which deed, omitting the description of the property, is as follows:

"This deed, made this 17th day of May, 1893, between Ellen W. Berkeley, of Farmville, Va., party of the first part, and R. B. Tuggle, party of the second part, Witnesseth, that for and in consideration of the covenants and agreements hereinafter made by the said R. B. Tuggle to and with the said Ellen W. Berkeley, she, the said Ellen W. Berkeley, doth grant, bargain, sell and convey unto the said R. B. Tuggle her life estate in that certain house and lot in the town of Farmville.

. . . In consideration whereof the said R. B. Tuggle covenants and agrees to and with the said Ellen W. Berkeley that he will pay unto the Commonwealth of Virginia, the county of Prince Edward, and the town of Farmville, all sums of money which have been hitherto assessed as taxes on said house and lot, for which the same has been returned delinquent, estimated to amount to the sum of $600 principal, interest and costs. And the said R. B. Tuggle doth further covenant and agree that whenever she, the said Ellen W. Berkeley, shall pay to him the sum of money so paid by him on account of such delinquent taxes with interest from the time of his payment, to the Commonwealth, county and town, and all sums of money he shall pay on account of taxes hereafter to be assessed upon said house and lot, with interest from the times at which he shall pay the same, he, the said R. B. Tuggle, will reconvey unto her, the said Ellen W. Berkeley, the estate for her life in said house and lot hereby conveyed by her to him. Witness the following signatures and seals this day and year first above written.

ELLEN BERKELEY (Seal),
R. B. TUGGLE (Seal).

By five separate conveyances, between 1892 and 1897, R. B. Tuggle acquired title to the interests of five of the remaindermen in this property, and in March, 1897, he filed a bill in the Circuit Court of Prince Edward county, with a view to a sale of "the garden" lot; he alleged that he was the owner of this lot, except the remainder interest of the infant Robbie B. Berkeley; that he was the absolute owner of the life estate; that he was willing to release to the infant the life estate of Ellen W. Berkeley in her one-sixth interest; that the property was not susceptible of partition in kind, and asking that the interest of the infant in the lot might be sold to him. Those proceedings resulted in a sale of the infant's interest in "the gar-

"den" lot to Tuggle for $333.33⅓, and he thereafter sold this lot for $2,000.00, receiving the entire proceeds of sale except the share of the infant.

By four deeds executed June 6, 1893, August 20, 1894, March 2, 1897, and June 4, 1898, R. B. Tuggle conveyed the interests he claimed in the entire property held by R. B. Berkeley, trustee, to the trustees of the Farmville Building & Trust Company to secure various sums of borrowed money, and the trustees in these deeds, at the request of the Building and Trust Company and of Tuggle, advertised for sale the dwelling house and the lot upon which it is situated, as though the deeds under which they were acting conveyed an absolute title, independent of any interest therein owned by Ellen W. Berkeley or her infant child—Robbie B. Berkeley. Whereupon, Ellen W. Berkeley, Robbie B. Berkeley, and R. B. Berkeley, trustee, obtained an injunction restraining the trustees from making sale of the property until the further order of the Circuit Court of Prince Edward county, and upon the hearing of the cause, upon the pleadings, the exhibits therewith, and the depositions for plaintiffs and defendants, the court perpetuated the injunction both as to the interest in remainder held by Robbie B. Berkeley, and the life estate of Ellen W. Berkeley, and from this decree R. B. Tuggle appeals.

The learned Judge of the Circuit Court* has, in a written opinion, made a part of the record, discussed in a satisfactory manner the principles involved in the case, and we, therefore, adopt it as a part of this opinion, omitting statements which we have already made herein and which need not be repeated:

"The deed from Ellen W. Berkeley of date May 17, 1893, to R. B. Tuggle contains a stipulation for a reconveyance of the property to her 'whenever she shall pay to him the sum of money (estimated at $600) so paid by him on account of such delinquent taxes with interest thereon from the time of his

---

*Judge George J. Hunley.

payment,' etc.   The property in which the plaintiff so conveyed her life estate consisted of two lots, the one on which she resided, and another known as 'the garden.'   .   .   .   At the time of these transactions, the defendant, Tuggle, who had married the daughter of the plaintiff, boarded his wife with her mother, and agreed to pay a stipulated price for her board, and for his own, for such time as his business permitted him to spend with them.

"It appears that the family of the plaintiff was a large one, . and that she was striving to make a living for herself and them by keeping boarders, and her son-in-law seems to have been the only male member of the family to whom she could look for counsel and advice, or help in time of need.   The struggle must have been a hard one, for she permitted the taxes on her home to become delinquent, and to pile up until they reached the sum of $618.33, and she was threatened with a suit to subject her life interest to the payment of these taxes by a stranger who had acquired a lien upon the interest of one of her sons in the remainder.   Under these circumstances, she applied to her son-in-law for help, and he agreed to raise the money and pay the taxes if she would convey to him her life interest, to which she consented, and made the deed with reservation before alluded to.  'She testified that before she made the deed, Tuggle stated to her that all he wanted was to free the property from the tax lien in order to preserve the home for the family as long as she lived, and she also testifies that before "the garden lot" was sold he told her 'if they would consent to that sale he would reconvey her life interest, and the interest of Mary and Fannie in the home lot.'   These statements are not denied by defendant, Tuggle, in his deposition.

"Up to this time Tuggle paid board in money, but after that it was agreed between them that the board should be offset against the rent of the house until he and his wife moved to Nottoway, when it was agreed that plaintiff should pay the in-

surance and taxes only as compensation for the use of the house. It is conceded that the plaintiff has all the time remained in possession of the residence, and that she knew of and made no opposition to the sale of the 'garden lot,' and asserted no direct claim to any part of the proceeds. Three letters of the plaintiff are also filed in the record as evidence for the defendant, in all three of which she more or less plainly recognized Tuggle as the owner of the "home lot," and acknowledged herself to be his tenant, though she refers in these letters to the sale of the garden lot, saying she had hoped the money from that would have relieved him financially.

"In this state of facts, the questions presented for consideration and determination by the court are these:

"1. Is the deed executed by the plaintiff to R. B. Tuggle a mortgage, and as such subject to the equity of redemption, or is it simply the evidence of a conditional sale which has become absolute by a failure to comply with the conditions?

"2. If it be construed as a mortgage, has Mrs. Berkeley lost the right to redeem by parting with her equity of redemption, or by such declarations or conduct as will estop her from asserting any interest in the property?

"It is true that both forms of sale are conditional, but the vital distinction between them is this: the equity of redemption is an inseparable incident of a mortgage, so much so that it cannot be defeated, restrained, evaded or in any other way impaired, even by agreement of parties, as long as the mortgage continues a security, though the mortgagee may become a purchaser of the equity of redemption, and thus combine the legal and equitable estates in his own person. Courts of equity, however, scrutinize transactions of this character with the utmost care, and ever stand ready to set them aside, and grant relief to the debtor whenever a gross inadequacy of price or any circumstances of oppression or mistake appear.

"On the other hand, in the case of a conditional. sale, the non-performance of the condition renders it absolute, both at law and in equity.

"In order to determine the true construction of such deed, it is well settled that parol evidence is admissible, and that a deed absolute on its face may be by such evidence converted into a mortgage. See 1 Jones on Mortgages, p. 223, sec. 301. It is a well established rule of equity that in cases of doubt such instruments are construed as mortgages. All the authorities agree as to that.

"Keeping in mind these preliminary propositions, let us address ourselves to the first question. Is the deed in this case a mortgage, or does it evidence simply a conditional sale?

"Mr. Minor, in Vol. 2 of his Institutes (4th ed.), p. 338, says: 'The marks whereby a mortgage is discriminated from a conditional sale are these: (1) That no price or an inadequate one is set on the property. (2) That the grantor remains in possession. (3) That. there is a covenant or promise obliging the grantor to pay the money.'

"As a legal proposition, too, it cannot be disputed that it is essential to a mortgage that there should be a debt to be secured, and there can be no debt without a promise to pay, either express or implied.

"As to the first two marks of a mortgage, it seems that the conditions are adequately met in this case. The price set upon the property is certainly inadequate, as the plaintiff's interest in the 'garden lot' alone, calculated by the tables, was worth more than the consideration in the deed, and it is not disputed that she has never been deprived of the possession of the property. It is strenuously contended, though, by counsel for Tuggle, that the plaintiff must fail on the last proposition, that there was no debt, that there is no covenant or promise to pay by the grantor. Looking to the face of the deed alone this is certainly true, there is no express promise to pay the debt. In

*Snavely* v. *Pickle and Others*, 29 Gratt., pp. 34-'5, it is said by the court, 'that whilst it is essential to a mortgage that there should be a debt to be secured, it (the debt) may be antecedent to or created contemporaneously with the mortgage.'

"In the case at bar there was no antecedent debt, but the consideration mentioned in the deed is a promise or undertaking on the part of the grantee to pay a pre-existing debt of the grantor, and it is conceded that he paid this debt for her.

"The question then is, Will a court of equity, in the interest of a wise and humane and just exercise of its jurisdiction, imply a promise to pay this debt on the part of the grantor in the deed, or will it become narrow and technical in order that the grantee may claim an absolute title to property worth double what he paid for it? Mr. Minor says, 'a promise is implied if it can be otherwise shown to be a mortgage,' see 2 Minor's Insts. 338; and on pp. 333-'4, he says: 'An action lies on a mortgage to recover the money thereby sought to be secured unless it be stipulated that recourse shall be to the subject mortgaged alone.'

"In view of these authorities, and following what I conceive to be the dictates of justice, I must hold that this last and necessary requisite is not lacking, and that the deed in question is a mortgage.

"It is hard to perceive, though, how the defendants would be in any better position in that respect, if the deed should be construed as evidencing a conditional sale only. There is no time fixed for the performance of the condition, and the language of the deed itself is significant. It refrains from naming a day, and uses the word 'whenever,' which is certainly very broad. It says 'whenever' she pays the money the property shall be reconveyed to her.

"It is true that when no time is specified the law implies a reasonable time. Suppose the deed had given her five or six years to comply with the condition, would this have seemed

unreasonable? Then, why should the law fix a less period as a reasonable one?

"Under such circumstances as these, our Court of Appeals has often held that a very much longer period was not unreasonable, where the transactions were had between near relatives, who might naturally be supposed to be forbearing towards each other. It has been so held in cases where it has been sought to raise the presumption of payment of a debt after a great lapse of time. The 'garden lot' was sold just four years after the deed was made, and Mrs. Berkeley contends that the condition was then complied with. Mrs. Berkeley says, in response to the eleventh question of her deposition, that 'Mr. Tuggle said that he would reconvey my life interest and that of Mary and Fannie in the home lot if we would consent to sell the garden lot.' Her deposition was taken on the 21st day of February, 1900, and on the 26th day of the same month, Tuggle's deposition was taken, and he makes no denial of this statement.

"The defendant, Tuggle, in his deposition, seems to claim that his title to the property is based upon the deed and the plaintiff's letters, but the first letter was written in 1898, and the others in 1899, and yet he says that at the time of the sale of the garden lot, in 1897, the property was his and the proceeds of the sale of the lot were his. Neither he nor his counsel fix upon any time when the right to redeem lapsed, and, without any aid in the shape of evidence or suggestion, it is impossible for the court to fix a time.

"After all, then, the only real question in the case seems to be the second one stated, to-wit: Has Mrs. Berkeley parted with her equity of redemption, or is she estopped from asserting her right to it now, by long acquiescence in the construction put on the deed by Tuggle, or by her admissions contained in the letters referred to.

"A release of the equity of redemption will not be inferred from equivocal circumstances or loose expressions. It must

appear by a writing importing in terms a transfer of the mortgagor's interest, or such facts must be shown as will estop him afterwards to assert any interest.  See 1st Jones on Mortgages, sec. 340, p. 249.

"The first branch of this proposition has no application to the case at bar, as it is not pretended that Mrs. Berkeley sold her equity of redemption, but it is contended that she is estopped by consenting to the sale of the garden lot, and failing to claim any part of the proceeds, and by her acquiescence in the construction placed upon the deed by Tuggle.  It is proper to say that the expressions in those letters can hardly be termed loose or equivocal.  They constitute a pretty plain acknowledgment of absolute title in Tuggle, and in them she made no mention of any promise on the part of Tuggle to reconvey her life interest, provided she consented to the sale of the garden lot.  Is she, then, estopped by her words and actions from making a claim now?  Let us first consider the personality of the contending parties, their situation, their relations to each other, and all the circumstances surrounding them, and in the light of these facts we shall be better enabled to determine this question.

"The evidence is that the plaintiff, at the time of these transactions, was a widow with a large family, many of them girls whom she was striving to support by keeping a boarding-house. That she was not a business woman, and was not possessed of enough worldly wisdom to care for her own interests, is manifest from all the facts and circumstances.  We should rather infer from the evidence that she was an unselfish woman, unsuspicious, gentle, and confiding in her nature.  With her very best efforts she found her home gradually slipping away from her grasp, and knew that she must have help or go under. The words and actions of such a woman under such circumstances cannot be judged by any fixed standard or known rules of conduct applicable to men.  To do so would be running counter to all ex-

perience, and a violation of truth and justice. It does not appear that Tuggle was a man of means, or that he sought to entrap or over-reach her in any way, but he was a business man, well acquainted with the world and its ways, and capable of taking care of himself. She was in debt; she was distressed, and in her trouble she confided in him and gave up all she had to secure him. She doubtless thought that the home would be safe anyway. When he informed her that it must be sold she did not reproach him, she did not remind him of the promise she said he had made; she simply and plaintively said, 'Wait awhile, until I can make arrangements to buy. I must have some place to live, and for my children to come to when not at work.'

"He plainly asserted title to the home, and she as plainly admitted it. Must the court hold her to the admission? Did this man and this woman meet on equal terms? Surely, if any evidence of Mrs. Berkeley's utter incapacity to take care of her own interests were wanted, it can be found in her actions immediately after the execution of the deed to Tuggle.

"Although the terms of the deed plainly gave her the right to a reconveyance of the property upon the payment of the debt ($600) and interest, she immediately assented to an arrangement by which Tuggle was to receive $240 a year for the use of the $600, or nearly seven times the interest due under the deed. Is it conceivable that she at that time understood her rights, and knew what she was doing? If the decision now is in her favor, Tuggle will have received back every cent of his money with interest, and she will keep the home which was provided for her by the foresight and love of her father and husband. If it be against her, she will lose her home without having received anything whatever for it, and Tuggle will have received in money and property double the amount loaned, and perhaps more. In cases of this kind, the courts, both State and Federal, have followed the dictates of humanity and refused to

hold parties responsible for admissions made under such cir-
cumstances.

"Two notable instances of this are to be found in a decision of
our Court of Appeals—*Snavely* v. *Pickle,* 29 Gratt., pp. 34-'5,
and a decision of the U. S. Supreme Court, *Villa* v. *Rodriquez,*
12 Wall. 339, 30 L. Ed. 406. In both cases the deeds were ab-
solute on their face, but the court on parol testimony construed
them to be mortgages. In the latter case the court says : 'Prin-
ciples almost as stern are applied as those which govern where
a sale by a *cestui que trust* to his trustee is drawn in question.
He must hold out no delusive hopes; every doubt must be
solved against him.' There are some striking similarities be-
tween that case and this. In that case it was a brother dealing
with his widowed sister and her children. He had loaned her
money on a mortgage, and subsequently procured from them
an absolute deed to property worth double the amount of his
loan, telling her that he was doing this to save the property,
and that he would do right by them. He then leased the prop-
erty to a third party, and gave him an option to buy at some
future time. This third party made valuable improvements
on the land, but the court took it from him, and allowed
the brother the money he had loaned with interest and gave
back the property to the widow and the children, notwithstand-
ing every evidence of previous disclaimer by them. It is not
at all probable that either of the parties in the case at bar has
been actuated by any unworthy motive. Each has most prob-
ably acted under a misapprehension of his or her respective
rights in the premises. It is strange that, in the face of this
deed, Tuggle should always have claimed absolute title to the
property, and it is hardly less strange that from the very first
Mrs. Berkeley should have seemingly acquiesced in that claim.
Probably at that time neither was very particular. They were
dwelling harmoniously together as one family, and in a measure
seemed to hold all things in common, and neither held the

other up to strict rules of business, if, indeed, they understood them. It seems certain, moreover, that when the plaintiff wrote those letters she did not understand her rights. She could hardly have known the true value of her life interest in the garden lot, which the defendant, Tuggle, sold for $2,000, as it is a matter of difficult calculation, the principles of which are known almost exclusively to lawyers, and she ought not to be held to strict accountability for the expressions used in her letters, or for her apparent acquiescence in Tuggle's construction of the deed. She can claim also that she was the victim of delusive hopes held out to her in the declaration of Tuggle; that he only wanted to preserve a home to her and the family during her life, and who can say that she had not reposed in confidence on that promise? If she did, then she is not to be charged with conscious acquiescence. For these reasons, the court is of opinion that the plaintiff, Ellen W. Berkeley, is now entitled to claim the benefit of her equity of redemption in the property conveyed, and that an account should be taken between the said plaintiff and the defendant, R. B. Tuggle, in which she shall be charged with the money advanced for her or paid by Tuggle, with interest, and shall receive credit for the value of her life interest in the garden lot, calculated according to the established rule as of the date of the sale thereof, and also for board furnished the defendant and his wife, and any payments otherwise made. As it is manifest from the evidence that upon such a settlement nothing will be due to the defendant, Tuggle, from the plaintiff, the injunction heretofore awarded in this case will be made perpetual as to the interests of the plaintiff and Robbie B. Berkeley, leaving the Farmville Building and Trust Co. free to subject to the payment of its debt such interests as the defendant, R. B. Tuggle, may have in the property. It follows, of course, that the deed from the plaintiff to the defendant, Tuggle, being construed as a mortgage to which the equity of redemption attaches, and being

duly recorded, the defendant, The Farmville Building and Trust Co., was affected with notice of the equities of the plaintiff, and cannot be considered as an innocent purchaser for value without notice, and took nothing under the deed from Tuggle save such interest as he had in the property." See also *Peugh* v. *Davis*, 96 U. S. 335, 24 L. Ed. 775; 2 Minor's Inst. (4th ed.), p. 337; and 1 Jones on Mortgages, secs. 265, 266, 274 and 275.

It will be observed, however, that the opinion of the learned Judge below makes no reference to the one-forty-ninth interest in the property advertised for sale by the trustees of the Building and Trust Co. which descended to Ellen W. Berkeley from her deceased child, Willis; nor does the decree entered pursuant to the opinion and appealed from, as it should have done, restrain the trustees and the Building and Trust Company from selling that interest in the property, as well as Ellen W. Berkeley's life estate therein, and this is assigned as error by appellees, under Rule IX. of this court. The decree in this respect will, therefore, be amended, and as so amended affirmed.

*Amended and Affirmed.*